## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION-MDL-1928

THIS DOCUMENT RELATES TO:

BAKAN et al v. BAYER CORP et al,
Case No. 08-CV-80423

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF CASE-SPECIFIC EXPERT AND FOR SUMMARY JUDGMENT AND COMBINED MEMORANDUM OF LAW IN SUPPORT

PLEASE TAKE NOTICE that Plaintiff Deborah Bakan ("Plaintiff"), Individually and as Personal Representative for the Estate of Howard Lucas, submits this Opposition to Bayer's Motion for Summary Judgment and to Exclude Expert Testimony of Carl J. Blond, M.D., Ph.D. Dr. Blond's proposed testimony is relevant, reliable, and methodologically sound and will be of assistance to the jury. Dr. Blond's testimony is admissible in full for the reasons articulated herein. In addition, genuine issues of material fact exist on the issues of causation, therefore, Bayer's motion for summary judgment should be denied.

## I.     BACKGROUND

Mr. Howard Lucas was a seventy-eight (78) year old father of two at the time of his premature demise on January 18, 2006. At the time of his death, Mr. Lucas was retired from his career in the music industry and was working part-time at Publix. The events leading to his death began when he was admitted to Sarasota Memorial Hospital on December 20, 2005, complaining

of shortness of breath.  Ultimately, he was scheduled for a combination aortic valve replacement and coronary artery bypass graft ("CABG") surgery.  His surgery was performed on December 22, 2005. Unfortunately, Mr. Lucas' surgeon, Dr. Clifton Lewis, was inadequately warned regarding the true risks of Trasylol and prescribed this medication to a gentleman with stage 3, chronic kidney disease. At the time Trasylol sales were suspended by Bayer, the warning label indicated that the risk of dialysis "may be especially increased for patients with pre-existing renal impairment."  See 2006 Trasylol warning label**.** (Ex. 1).  On postoperative day one, Mr. Lucas' serum creatinine began to steadily rise.  By postoperative day six, it was recommended that Mr. Lucas undergo dialysis. Unfortunately, Mr. Lucas' postoperative course continually deteriorated, and his kidney function was never restored..  As a result, Mr. Lucas ultimately passed away on January 18, 2006 leaving behind his two children.

Plaintiff has presented the expert opinion of Dr. Carl Blond.  As is set out below, Dr. Blond is eminently qualified and used a differential diagnosis to determine that Trasylol was, to a reasonable degree of medical certainty, more likely than not, both: (1) a primary contributing cause in the development of Mr. Lucas' acute renal failure; and (2) that Mr. Lucas' acute renal failure was the primary contributing factor to his septic shock and death.  Bayer has moved to exclude Dr. Blond's opinions as unreliable.  The ultimate tenor of Bayer's motion, however, is an attack on the weight to be attributed to Dr. Blond's testimony, as there can be no question his methodology was reliable.

In addition to the motion to exclude Dr. Blond's testimony, Bayer has moved for summary judgment on four grounds: (1) that because Dr. Blond's testimony should not be admitted, Plaintiff cannot prove specific causation; (2) that Plaintiff cannot show that "but for" Trasylol Mr. Lucas

would not have suffered his injury; (3) that Dr. Lewis was independently aware of the risk of renal

failure caused by Trasylol; and (4) that Dr. Lewis did not read the Trasylol package insert, thus a

warning would not have prevented his use of the drug.  Bayer is incorrect on all counts.  Bayer's

effort to persuade this Court that summary judgment is proper misstates the record and takes much

of the testimony and the record completely out of context.  Bayer's motion consistently uses

selective portions of the transcripts and fails to point the Court to testimony that directly contradicts

Bayer's arguments.  As is shown, because genuine issues of material fact exist on all of these issues,

Bayer is not entitled to summary judgment and the motion should be denied.

## II.     ARGUMENT

### A.     Dr. Blond Conducted a Reliable Differential Diagnosis and his Testimony is Admissible

The admissibility of expert testimony is controlled by Federal Rule of Evidence 702 and

*Daubert v. Merrell Dow Pharmaceutials, Inc.*, 509 U.S. 509 (1993), and its progeny.  Under Rule

702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  "*Daubert* requires the trial court to act as a gatekeeper to insure that speculative

and unreliable opinions do not reach the jury."  *McClain v. Metabolife Int'l Inc.*, 401 F.3d 1233,

1237 (11th Cir. 2003) (citing *Daubert*, 509 U.S. at 589 n.7, 597). "The gatekeeper role, however,

is not intended to supplant the adversary system or the role of the jury: '[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

The admissibility standard is intended to be liberal. *See United States v. Frazier*, 387 F.3d 1244, 1293 (11th Cir. 2004) (citing *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)). In performing its gatekeeping role, the court should bear in mind that "[a]s stated in the Advisory Committee Notes accompanying Rule 702 of the Federal Rules of Evidence, 'A review of the case law after *Daubert* shows that the rejection of expert testimony is the **exception rather than the rule**.'" *Warfield v. Stewart*, 2009 WL 2421594 *1 (M.D. Fla. July 31, 2009) (quoting Advisory Committee Notes to the 2000 Amendment to Rule 702) (emphasis added).

The Eleventh Circuit has further refined the inquiry into whether expert testimony is admissible under Rule 702 through a three part test:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. V. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003). "[T]he primary purpose of any *Daubert* inquiry is for the district court to determine whether that expert, 'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Bayer's motion does not make an issue out of the qualifications of Dr. Blond. However, his background and credentials are highly relevant to the question of the reliability of his methodology. See *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 616 (S.D.N.Y. 2007) ("the more highly qualified the expert, the more likely that he is using reliable methods in a reliable manner"). Dr. Blond is a Clinical Professor of Internal Medicine and Nephrology at the University of Texas Health and Science Center School of Allied Health ("UTHSCA"). See Dr. Blond Expert Report ("Blond Rep.") (Ex. 2) at 1. He has practiced medicine for approximately twenty-nine (29) years and presently confines his practice to the areas of nephrology and internal medicine. *Id.*. He has held the Chairman position and acted as a Physician Reviewer in Nephrology; he also has extensive experience as a sub-investigator in numerous clinical trials. See Dr. Blond CV (Ex. 3) at 4. He has been Board Certified in Internal Medicine and Nephrology since 1984 and has been a member of the teaching program at the UTHSCA throughout the twenty-eight (28) years of his practice in San Antonio. See Blond Rep. (Ex. 2) at 1. He has received several honors, including selection as one of "The Best Doctors in America" for multiple years and has served on the Board of Directors for the Kidney Foundation, the Biomedical Research Foundation of South Texas, Inc., and Sitota Agricultural Project. See Dr. Blond CV (Ex. 3) at 2-3. He also treats approximately 100-300 cases per year of acute kidney injury following surgery. Deposition of Carl Blond, M.D., Ph.D. ("Blond Dep.") (Ex. 4) at 52:9-23. Despite these qualifications, Bayer attempts to argue that Dr. Blond failed to reliably conduct a differential etiology in this case.

The sole basis for Bayer's motion to exclude Dr. Blond's opinion is its view that the

methodology he employed, a differential diagnosis or differential etiology, is not sufficiently reliable.  As is set out below, Bayer's unfounded attack on Dr. Blond's methodology is based more on hyperbole than fact.  Bayer offers a disingenuous and meritless attack on the methodological reliability of Dr. Blond's opinions by relying upon careful phrasing and selective citations to create the false impression that Dr. Blond's opinions lack the support of scientific, peer-reviewed data. Nothing could be further from the truth.  In fact, when Dr. Blond's opinions and testimony are examined *in toto*, it is abundantly clear that he has considered and derived his opinions from a careful review of both Mr. Lucas' medical records and an extensive array of scientific methods/data including the differential diagnosis method and the findings of published and independently verified studies. Bayer's primary point of contention is a disagreement with the ultimate conclusion he draws, and the arguments it makes in the cloak of reliability go more toward weight and credibility. Accordingly, these arguments are more appropriately explored through vigorous cross-examination before the jury.

It is Dr. Blond's opinion that Trasylol was a substantial contributing factor that caused Mr. Lucas to suffer acute renal failure with dialysis that ultimately resulted in his death.  Blond Dep. (Ex. 4) at 124:22-125:14; Blond Rep. (Ex. 2) at 5,6.   Dr. Blond bases this opinion, in part, on the well-founded medical literature linking exposure to Trasylol and the risk of postoperative kidney injury. Specifically, he relied upon a large-volume of medical and scientific literature that showed an association of acute kidney injury with the use of Trasylol.  Blond Rep. (Ex. 2) at 5.  Bayer conveniently ignores the fact that Dr. Blond reviewed and relied upon several studies and clinical trials regarding Trasylol and acute renal failure.   Dr. Blond applied the knowledge he gained from this well-founded body of medical and scientific literature, including knowledge he attained in his

training and clinical experience, and appropriately ruled in Trasylol as a cause of Mr. Lucas' postoperative acute kidney injury.

Conducting a differential diagnosis (more appropriately referred to as a differential etiology) is an accepted and reliable methodology. *See McClain*, 401 F.3d at 1252. "An overwhelming majority of the courts of appeals . . . have held that a medical opinion based upon a reliable differential diagnosis is sufficiently valid to satisfy the [reliability] prong of the Rule 702 inquiry." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 178 (6th Cir. 2009). "Differential diagnosis 'is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded as the most likely.'" *Guinn v. Astrazeneca Pharmaceuticals LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).

The Eleventh Circuit has set out a general guideline to determine whether a differential diagnosis methodology is reliable under *Daubert*. *See McClain*, 401 F.3d at 1253. The test, as adopted from the Ninth Circuit states that "[t]he first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id.* (quoting *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057-58 (9th Cir. 2003)).[1] Once a comprehensive list is generated, the expert then must begin the process of eliminating potential causes. Notably absent from Bayer's recitation of the applicable law, however,

---

[1] Bayer points to the case of *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 596 (N.D. Fla. 2009), to attempt to argue that "all" possible causes must be listed. However, as seen above, the Eleventh Circuit has not adopted any precedent with such a requirement. Still, despite this additional modifier added by the Northern District Court, Bayer cannot point to any possible alternative cause that was not considered by Dr. Blond.

is that a differential diagnosis does not have to rule out **all** possible causes.  *See Guinn,* 602 F. 3d

at 1253.  The analysis only needs to "consider other factors that could have been the **sole cause** of

the plaintiff's injury."  *Id.* (emphasis added).  The expert must be able to offer "a reasonable

explanation as to why 'he or she has concluded that [any alternative cause suggested by the defense]

was not the sole cause' of the plaintiff's injury."  *Id.* (quoting *Best v. Lowe's Home Ctrs., Inc.*, 563

F.3d 171, 179 (6th Cir. 2009) (citations omitted)).  Stated in another fashion, "[a]n expert is not

required to rule out all alternative possible explanations.  'Only where a defendant points to a

plausible alternative cause and the [expert] offers no explanation for why he or she has concluded

that was not the sole cause, that [expert's] methodology is unreliable.'" *Southern States Cooperative,*

*Inc., v. Melick Aquafeeds, Inc.*, 2010 WL 1224089 *12 (M.D. Ga. March 22, 2010) (quoting *Heller*

*v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999)).  In contrast to the position asserted by

Bayer, "[w]hether the expert considered every 'possible' alternative cause shall affect the weight

of the testimony and not its admissibility."  *In re Mentor Corp. ObTape Transobturator Sling Prod.*

*Liab. Lit.*, 2010 WL 1664965 *20 (M.D. Ga. April 22, 2010).

     A review of the record in this case shows that Dr. Blond's differential diagnosis is reliable.

Dr. Blond reached his "conclusion through a differential diagnosis after a review of Mr. Lucas'

medical records and determining all potential causes for his ultimate renal failure."  Blond Rep. (Ex.

2) at 5.  A complete review of the record, rather than a selective one, shows Dr. Blond's

methodology is the exact type of methodology deemed to be reliable in the Eleventh Circuit.

     Despite Bayer's protestations, Dr. Blond reviewed the relevant medical records.  He

reviewed approximately four and one-half binders of medical records over a period of eight to

twelve hours.  Blond Dep. (Ex. 4 ) at 7:10-20.  In fact, he spent approximately the same amount of

time reviewing Mr. Lucas' medical records as Dr. Goldfarb, the nephrologist hired by Bayer to offer the opinion that Mr. Lucas' acute kidney injury was not caused by Trasylol.  Deposition of Stanley Goldfarb, M.D. ("Goldfarb Dep.") (Ex. 5) at 18:24-19:2.

There is simply no indication that Dr. Blond's review of Mr. Lucas' medical records was hurried or cursory.  In support of its argument, Bayer points to one statement in Dr. Blond's report regarding the length of time on-pump during Mr. Lucas' surgery as evidence that Dr. Blond carries a mistaken understanding of the facts.  Specifically, Dr. Blond's report states that "the patient's bypass was one hour and 24 minutes."  Blond Rep. (Ex. 2) at 3.  Bayer uses this statement in an attempt to argue that Dr. Blond did not understand the length of time Mr. Lucas was on-pump and thus, he cannot have appropriately accounted for this potential cause or risk factor.  However, a complete review of the record indicates that the statement in Dr. Blond's report is nothing more than a typographical error caused by the dictation equipment used by Dr. Blond.  In any event, Dr. Blond's report and testimony make clear that he considered the prolonged pump time in his differential diagnosis.

As was set out in his deposition, Dr. Blond uses Dragon Speak to dictate his reports.  Blond Dep. (Ex. 4) at 8:19-9:6.  Using this software, the phrasing "one hundred twenty four minutes" could easily be transposed to "one hour and 24 minutes."  At no point in Dr. Blond's report does he write that the pump time was "eighty-four minutes."  Further, in his report and in his deposition, Dr. Blond states that Mr. Lucas had a prolonged surgery and he discusses this as a risk factor he considered in rendering his opinions in this case.  Blond Dep. (Ex. 4) at 104:14-20; 105:20-24; 111:12-19; Blond Rep. (Ex. 2) at 4.  Thus, Dr. Blond accounted for the pump time of greater than one hundred and twenty minutes.  He would not have accounted for this factor had he believed that Mr. Lucas'

pump time was in fact eighty-four minutes.[2]

While Dr. Blond did not review all of the records that pre-dated Mr. Lucas' admission at Sarasota Memorial Hospital, he reviewed the records relevant to the formulation of his opinion. There is simply no legal requirement that all records be reviewed.  Again, the standard is whether the expert employs the same rigorous methods before the jury as he does within the practice of his profession. *See McClain,* 401 F.3d at 1255.  There can be no doubt that Dr. Blond has done just that in this case.  In fact, he reviewed the same set of records that were reviewed by Mr. Lucas' treating nephrologist, Dr. Lazin, at the time Dr. Lazin was treating Mr. Lucas' acute kidney injury. Deposition of Andrew Lazin, M.D., ("Lazin Dep.") (Ex. 6) at 49:4-25.

Bayer also attempts to argue that Dr. Blond has an obligation to review all of the depositions of Mr. Lucas' treating doctors to reliably assert his opinions.  Again, this is not the law.  However, when the Court reviews the complete record, rather than a selective snapshot, it is clear that Dr. Blond, at the least, reviewed Dr. Lazin's deposition.  While Dr. Blond did in fact testify during his deposition that he did not review the depositions of any of Mr. Lucas' treating physicians, a simple review of his report shows that he did.[3]  If Dr. Blond had not reviewed these depositions, he would not have known that Dr. Lazin, Mr. Lucas' treating nephrologist, testified that Trasylol was appropriately considered as a potential cause of Mr. Lucas' renal failure and that nephrotoxic agents should be avoided in patients like Mr. Lucas with pre-existing renal disease, as was stated

---

[2] Interestingly, Bayer's own expert during his deposition also misstated the pump-time for Mr. Lucas in that he stated he believed the pump time was one hundred and forty minutes. Goldfarb Dep. (Ex. 5) at 132:14-18.

[3] It should be understandable that Dr. Blond could not remember reviewing these depositions.  His deposition in this case was taken, at Defendant's request, after previously being deposed for six hours on the same day for a different plaintiff.  Blond Dep. (Ex.4) at 5:1-5:7.

in his report.  Blond Rep. (Ex. 2) at 5; Lazin Dep. (Ex. 6) at 148:2-8.[4]

As for the requirement of generating a "comprehensive list" of possible causes, a simple review of Dr. Blond's report shows that he considered the potential causes of Mr. Lucas' acute kidney injury and provided a reasonable explanation as to why the potential "sole causes" raised by Bayer were not the sole cause of the injury in this case.  Contrary to Bayer's claims, Dr. Blond accounts for each of the risk factors.  He acknowledges pre-existing renal insufficiency, diabetes, COPD, smoking history and age.  See Blond Rep. (Ex. 2) at 2.  In addition to his report, Dr. Blond testified in more detail during his deposition regarding pre-existing risk factors for acute kidney injury following open heart surgery. Blond Dep. (Ex. 4) at 62:7 - 65:8. Specifically, Dr. Blond testified as to the following risk factors for Mr. Lucas: (1) cardiopulmonary bypass; (2) chronic kidney disease; (3) hypertension (which he testified was well-controlled); (4) COPD; (5) congestive heart failure; (6) smoking history; (7) peripheral vascular disease; (8) age over 70; (9) urgent surgery; (10) contrast exposure; (11) atrial fibrillation; (12) anemia; (13) and leukocytosis.  *Id.*  He specifically pointed out that he believed chronic kidney disease was the worst risk factor for acute kidney injury requiring dialysis.  *Id.* Given his testimony and report, any suggestion that Dr. Blond did not derive a "cumulative list" of possible causes is frivolous.  To the contrary, Dr. Blond demonstrated a thorough understanding of Mr. Lucas' relevant medical history.

Bayer incorrectly asserts that Dr. Blond has an obligation to reasonably explain and exclude

---

[4] While Dr. Lazin testified in response to the question asked that it would be impossible to say whether Trasylol played a role in Mr. Lucas' renal failure, his answer to an additional question puts this answer in context to make clear the reason he believed it was impossible to tell was because he had insufficient information regarding Trasylol.  Lazin Dep. (Ex. 6) at 149:5-12.

all possible risk factors for Mr. Lucas' acute renal failure. To start, as seen above, there is no requirement to exclude and explain all possible causes. The only obligation is to offer an explanation of "sole causes" and particularly "sole causes" asserted by Bayer. In making its argument, Bayer misunderstands the difference between a "risk factor" and a cause. Risk factors are not causes. In fact, all of the "Pre-Operative Risk Factors" set out in the table in Bayer's motion are just what they state they are - risk factors. Bayer's own expert, Dr. Goldfarb, testified that, "[s]o risk factors are really associations. Risk factors don't cause disease." Goldfarb Dep. (Ex. 5) at 97:15-18.

Plaintiff recognizes and agrees that Mr. Lucas had pre-existing chronic kidney disease and other potential risk factors. However, the existence of risk factors like pre-existing chronic kidney disease did not cause Mr. Lucas' acute kidney failure, subsequent dialysis, and death. Events outside of these risk factors necessarily took place to cause the onset of acute kidney failure. Mr. Lucas' pre-existing risk factors simply made him more susceptible because of his limited renal reserve. See Blond Rep. (Ex. 2) at 6. While chronic kidney disease may have arguably placed him at higher risk, by definition it could not have caused his acute kidney injury. Not even Bayer's own expert, Dr. Goldfarb, suggests Mr. Lucas' chronic kidney disease was the cause of his post-Trasylol acute kidney failure, dialysis, and death. It was simply a factor that put him at higher risk.

In addition to the pre-operative risk factors, Dr. Blonds' testimony showed a thorough understanding of the relevant events that occurred during Mr. Lucas' surgery. In particular, he noted that Trasylol was infused, oxygen saturation was maintained and that Mr. Lucas was noted to have tolerated the procedure well. See *Id*. at 3. In the post-operative phase, Dr. Blond again demonstrated his detailed understanding of the events that cumulatively lead to the onset of acute

renal failure and Mr. Lucas' ultimate death.  See *Id*. at 3-4.

There is simply no merit to Bayer's argument that Dr. Blond did not sufficiently comprise the "cumulative list" as required by *McClain*.  Again, Bayer's argument is with his conclusions, not his methodology.  The arguments Bayer asserts regarding the date of diagnosis of Mr. Lucas' diabetes and hypertension are a pure red herring.  The fact remains that Dr. Blond was aware that Mr. Lucas carried these risk factors, and they were part of the "cumulative list" he comprised.

After setting out the "cumulative list," Dr. Blond then goes about excluding possible causes and determining causes that cannot be excluded as required by *McClain*. *See* 401 F.3d at 1253.  For instance, he notes that Mr. Lucas' stage 3, chronic kidney disease was stable prior to surgery.  See Blond Rep. (Ex. 2) at 5.  He notes he received IV contrast that only resulted in a small rise in creatinine level.  *Id.*  He ruled out nonsteroidal drugs as Mr. Lucas was not exposed to any nonsteroidal drugs perioperatively and the anesthetic agents used are not associated with significant nephrotoxicity. *Id*.  He rules out infection, hypotension and cardiac failure as these were not present in the immediate post-operative period at the time Mr. Lucas progressed into acute renal failure. *Id*.  He specifically accounts for the risk of developing renal failure as a result of cardiopulmonary bypass surgery.   In accounting for this risk, Dr. Blond points out that acute renal failure caused by cardiopulmonary bypass "is usually a transient phenomena associated with hypotension, hypoxia, oxidative stress and nephrotoxic agents.  Nephrotoxic agents include IV contrast, nonsteroidal drugs and rarely anesthetic agents."  *Id*. at 4.  He goes on to note additional risk factors specific to Mr. Lucas including "chronic kidney disease, prolonged and complex surgery, as well as underlying congestive heart failure."  *Id*.  As far as the ultimate possible causes (rather than risk factors), Dr. Blond points out that the mechanism for renal dysfunction from factors "associated with

cardiopulmonary bypass surgery" and causes of renal dysfunction in the post operative period. *Id.* at 5.

After accounting for and explaining the possible causes of Mr. Lucas' acute renal failure, Dr. Blond reaches the ultimate opinion that "[i]n all medical certainty, aprotinin was more likely than not the primary contributing cause in the development of acute superimposed on chronic kidney disease." *Id.*  It is interesting, given this statement, how Bayer would attempt to argue that Dr. Blond did not account for Mr. Lucas' chronic kidney disease as a primary risk factor for the onset of his disease when his ultimate opinion is that Mr. Lucas' acute kidney disease was superimposed upon chronic kidney disease.  Again, this just further shows the hyperbole present in Bayer's motion.

As for "sole causes" presented by Bayer, Dr. Goldfarb testified that he was able to rule out Trasylol as a cause of Mr. Lucas' renal failure because "I think that, in the case of Mr. Lucas, we have such clear evidence that he developed renal failure from an agent that is overwhelmingly likely to be the inciting agent is why I chose [contrast induced nephropathy] as the agent that was responsible for his acute renal failure."  Goldfarb Dep. (Ex. 5) at 73:2-13.  Dr. Goldfarb expounded further by testifying that "I think that the contrast nephropathy was clearly present in his case.  And I think, as I say here, that this whole picture is completely consistent with that.  This course of having prolonged renal failure requiring dialysis is completely consistent with him having contrast-induced acute renal failure."  *Id.* at 79:8-17.  In addition to this primary cause, he also testified that post-operative hypotension and persisting infection or sepsis were additional causation factors.  *Id.* at 79:23 - 81:17.  But to be clear, it is Dr. Goldfarb's opinion that the preeminent event and primary cause of Mr. Lucas' acute renal failure was contrast dye.  As he stated during his deposition, "I think

it all started with contrast-induced nephropathy, so that was the initiating event."  *Id.* at 84:21-23.

Dr. Goldfarb did not even include Trasylol in his differential diagnosis as he does not believe that

the administration of Trasylol can lead to renal failure.  See *Id.* at 96:12-23.  While Dr. Goldfarb

testified as to other risk factors, the three mechanisms for causation he identified were contrast dye,

hypotension and infection.   See *Id.* at 97:22 - 98:11.   Each of these three mechanisms were

considered and reasonably explained by Dr. Blond.

To start, Dr. Blond testified that acute kidney injury caused by contrast dye tends to be

"relatively short-lived."  Blond Dep. (Ex. 4) at 77:2-8.  Dr. Lazin in fact offered similar testimony

to Dr. Blond on this issue.  Lazin Dep. (Ex. 6) at 82:1-4 ("The dye can cause tubular injury in the

kidney.  It caused an elevated creatinine.  It's usually reversible and comes back down, but it does

increase his operative risk for kidney failure.").   In fact, Dr. Lazin testified that because Mr. Lucas'

renal insufficiency was not transient, "there had to be some other reason for that."  *Id*. at 89:23 - 90:3

("As I said, most times contrast is reversible.  And his wasn't reversible, so there had to be some

other reason for that.  Q: And you believe that to be the open-heart surgery?  A: Open-heart surgery

or medication.").[5]  In addition, Dr. Blond pointed out that the contrast dye used on Mr. Lucas was

a low osmotic agent.  Blond Dep. (Ex. 4) at 93:14-93:23.  This is important as, according to even

Dr. Goldfarb, "the lower osmolar agents do reduce the risk of contrast nephropathy, although it still

can be substantial, as we have seen."   Goldfarb Dep. (Ex. 5) at 104:2-4.   Still, Dr. Blond

acknowledged that he could not completely rule out contrast induced nephropathy.  See Blond Dep.

_____

[5]  The testimony offered by Dr. Lazin is completely consistent with the opinions offered
by Dr. Blond that is so roundly criticized by Bayer as being "so broad that they are
meaningless."  Like Dr. Blond, Dr. Lazin testified that in combination with the contrast dye,
open heart surgery and medication is the likely reason for Mr. Lucas' ultimate course.

(Ex. 4) at 94:5.  However, based upon his review of the medical record and his understanding of mechanism of action of Trasylol and the relevant scientific and medical literature, he concluded that Trasylol was a substantial contributing factor to Mr. Lucas' acute renal failure given that contrast dye does not typically advance to renal failure with dialysis.

Ultimately, Dr. Blond came to the conclusion that Trasylol was the primary contributing factor to Mr. Lucas' renal failure based upon: (1) the general recognition of the nephrotoxicity of aprotinin (including in the package insert in effect at the time Trasylol sales were discontinued); (2) the expert report of Dr. Gary Toback setting out the mechanism by which Trasylol injures the kideny; and (3) his review of the appropriate medical and scientific literature.  Blond Rep. (Ex.2) at 5.  After coming to this conclusion, Dr. Blond offers the final opinion that Mr. Lucas' acute renal failure requiring dialysis was the primary contributing factor to his death.  *Id*. at 6.  Notably, Bayer has not seriously challenged this statement as it recognizes such a challenge would be illogical.  In any event, a detailed review of the record, including Dr. Blond's report and deposition, show that Dr. Blond would employ the same methodology and rigor before the jury as he does in his own clinical practice.  See *McClain*, 401 F.3d at 1253. As such, the methodology he employed is reliable, and his testimony should not be excluded.  See *Bryant v. Bayer Corp*., Order on Motion to Exclude Plaintiff's Medical Experts, Case No. 08-80868, (S.D. Fla. March 1, 2010) (Document 4592 in Case No. 08-md-1928) (Ex. 7).

## B.     Genuine Issues of Material Fact Exist on Issues of Causation

Summary judgment is only appropriate when "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  In making the determination as to whether summary judgment is appropriate, the court "must consider all of

the evidence in the light most favorable to the non-moving party," and "resolve all reasonable doubts in favor of the non-moving party." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, in any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). "If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor." *Alvarez v. General Wire Spring Co.*, 2009 WL 248264 *4 (M.D. Fla. Feb. 1, 2009) (citing *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003)). As is set out below, a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, thus a genuine issue of material fact exists. Consequently, summary judgment should not be granted.

Given that Plaintiff has shown by a preponderance of the evidence that the testimony of Dr. Blond is admissible, a genuine issue of material fact exists as to causation. Under Florida products' liability law, Plaintiff has the burden to "show that [it] is 'more likely than not' that the defendant's act was a substantial factor in bringing about the injury." *Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1191 (11th Cir. 1995). The testimony of Dr. Blond meets this burden. He testified:

> Well again, the renal failure would not have occurred obviously–obviously if he hadn't had bypass surgery to begin with. I think the Trasylol was by his course–his operative course was–appeared relatively, again, well tolerated, and I think that Trasylol was a primary or aprotinin a primary hit to his kidneys, but I can't tell you that the bypass surgery wasn't also–I think you have to have more than one factor. You can't say that one factor was the cause. Obviously, if you put Trasylol with the bypass surgery, I think those were the two most likely and probably you need both

of those things to get acute to–acute renal failure to require dialysis in his case.  I don't think you can pull one from the other.  His surgery looked like to me from the standpoint of the procedure there were no technical complications in the follow-up with the surgery.  It was well tolerated as far as the surgical report, and so I'm not saying that I think that you can't have acute renal failure in the setting obviously without bypass surgery.  I think the thing that tipped the scale was the use of aprotinin during surgery because he certainly was at high-risk from all of the things that had happened prior to his surgery, the use of contrast we saw a rise in the creatinine post contrast, but then we saw a drop or stabilization, and so the things that strike me are the bypass surgery and the aprotinin.

Blond Dep. (Ex. 4) at 119:23-120:7.  As such, because Plaintiff has admissible evidence that Trasylol was a substantial contributing factor to both Mr. Lucas' acute kidney injury and ultimate death, summary judgment is not proper in this case on the issue of causation.  *See Bryant v. Bayer Corp*., Order on Motion for Summary Judgment, Case No. 08-80868, (S.D. Fla. March 1, 2010) (Document 4592 in Case No. 08-md-1928) (Ex. 7).

While Bayer has correctly outlined the law as it pertains to proximate cause in the context of a failure to warn case, Bayer continues to misrepresent the record in this case.  As is shown below, there is a genuine issue of material fact as to whether (1) Dr. Lewis, Mr. Lucas' cardiothoracic surgeon, was independently aware of the risk of renal failure with Trasylol; and (2) an additional warning would have changed the prescribing practices of Dr. Lewis.  This is particularly true given that Dr. Lewis testified that he believed he had previously seen the Trasylol warning label.

There is absolutely no material evidence in the record showing that Dr. Lewis was aware of the risk of renal failure associated with Trasylol prior to Mr. Lucas' surgery.  To try to make it appear there is such evidence, Bayer has selectively sampled minute portions of Dr. Lewis' deposition.  To truly understand his knowledge of the risks of Trasylol, his testimony, like all

testimony, must be viewed in context.  When viewed in context, there is absolutely no basis upon which to conclude that Dr. Lewis was "independently aware" of the risk of renal failure associated with Trasylol at the time of Mr. Lucas' surgery.

Dr. Lewis was asked to describe the risks of Trasylol he was aware of at the time he used it with Mr. Lucas.  See Lewis Dep. (Ex. 8) at 149:21-24.  He answered that there "was a suggestion of two things that I remember.  Now one, – three, three things.  One is anaphylactic response."  *Id*. at 149:25-150:2.  The second risk of which he was aware was neurological injury.  *Id*. at 151:4-10.  Finally, he adds that the third risk was "a potential for nephrotoxicity or renal insufficiency."  *Id*. at 151:12-14.  If this were his complete testimony, Bayer may have a point.  However, Dr. Lewis completes his answer as follows, "Okay? I – you know, when we got done with all this, in other words, when we – when all the – when 2006 hit, the main – I can't remember the guy's name. Mangano's article came out, the one that hit home, the one that anecdotally I would think is probably true is renal insufficiency.  Okay?"  *Id*. at 151:13-20.  Clearly, the appropriate inference to be drawn from Dr. Lewis' testimony is that he was not independently aware of a renal risk, and it certainly was not a risk confirmed in his mind, until the Mangano study was published in 2006 and he was informed of the true risks of Trasylol.  His knowledge of the risks of renal failure become even more clear just a few questions later:

> Q:  When you operated on Mr. Lucas in December 2005, you were aware that there was a potential for renal insufficiency as a result of using Trasylol; is that right?
> A:  There was a potential for that.
> Q:  Okay.
> A:  I would say that is different than the absolute knowledge of sort of a smoking gun, that this is the etiology of renal insufficiency.  And the other thing that you don't have is some way to balance whether or not the risk is worth it.

*Id.* at 152:22 - 153:7.  Accordingly, when his testimony is viewed in context and not selectively sampled, it is clear that Dr. Lewis was not independently aware of the risk of renal failure as he did not believe he possessed sufficient knowledge to appropriately balance the risks and benefits of the drug.  In other words, the chain of causation was not broken as the "learned intermediary" was incapable of acting in a "learned" fashion.

Dr. Lewis goes so far as to describe his knowledge of the renal risk, prior to the publication of the Mangano study, as "nebulous."  *Id.* at 198:9-16 ("Q: And the suggested renal issues and nephrotoxicity?  A: Yeah.  And those were – the latter two were particularly nebulous.  You know, most of these came more – well, I'm not even sure they were proven now.  But there was a hard suggestion of that renal failure, premature death, neurologic – negative neurologic outcomes after 2006, with the article.").[6]  Finally, when counsel for Bayer attempted to get Dr. Lewis to confirm he was aware of a risk of renal failure at the time he prescribed it to Mr. Lucas, he testified: "I think everybody was having suspicions to that effect.  . . . I don't believe – you can look back at the literature and see, but I don't believe there's absolute proof as of December 2005 that that's the case."  *Id.* at 213:15-25.  Of course, Bayer utterly failed to present any of this testimony to the Court as it well recognizes that this creates a genuine issue of material fact.  In any event, construing all evidence in a light most favorable to the Plaintiff, Bayer has not carried its burden of showing no genuine issue of material fact exists on this issue and summary judgment must be denied.

Bayer's final ground for summary judgment on the issue of the failure to warn is equally unavailing as Dr. Lewis specifically did not testify that he had never seen or read the Trasylol label.

---

[6]  The Mangano article in this case is particularly important given that Dr. Lewis, by the Spring of 2006, no longer used Trasylol specifically because of the information conveyed in this article.  *See* Lewis Dep. (Ex. 8) at 146:9 - 147:10.

Bayer again has selectively quoted portions of Dr. Lewis' testimony in an effort to take his testimony out of context.  While Dr. Lewis did testify that he does not generally read or rely upon package inserts, his testimony on the Trasylol package insert was much different.  Dr. Lewis was actually provided the package insert in effect at the time of Mr. Lucas' surgery.  *Id*. at 194:15-19.  The following exchange then took place:

> Q:  Is this something you would have reviewed at some point during or prior to beginning your use of Trasylol?
> A:  No.  I'm – I'm sure I've seen this, but I – that falls short of a definite that I have.  Okay?

*Id*. at 194:20-24.  Thus, Dr. Lewis' testimony regarding the actual Trasylol label is that he believed he had reviewed it.  Even the testimony cited by Bayer in its motion for summary judgment is not as clear as Bayer would suggest.  When asked whether he had any reason to believe he had reviewed the label prior to performing Mr. Lucas' surgery, he stated, "No.  I mean – I was privy, I'm sure, to some of this information but not all of it."  *Id*. at 211:22-212:1.  Bayer's counsel even acknowledged the possibility that Dr. Lewis reviewed the label when reviewing a portion of it with him:

> Q:  Okay.  So if you did read this label – and I understand you're not sure that you did before performing Mr. Lucas' surgery – you would have seen that 9 percent of Trasylol-treated patients experience this bump in serum creatinine above .5 milligrams per deciliter, is that right?
> A:  Yes.
> Q:  Knowing that, would that change your risk/benefit at all?
> A:  Well, no, because you didn't finish the sentence.  "8 percent in the placebo group developed the same elevation in the P value," which is the measured statistical significance, was ".248" which means its not statistically significant.
> Q:  Uh-huh.
> A:  Okay.  So if you take that sentence as a whole, what it would indicate is that there's no difference in the renal dysfunction with or without Trasylol from that particular study.  Okay?  That is the whole of the information . . . presented in the particular sentence.

*Id*. at 212:18 - 213:14.  It is disingenuous, at best, that Bayer would actually argue to this Court that, as a matter of law, Dr. Lewis did not read the Trasylol package insert in the face of this testimony. When appropriately construing the evidence in the light most favorable to the plaintiff, the conclusion cannot be drawn as a matter of law that Dr. Lewis did not review the Trasylol warning label prior to his use of the drug.

Further, it is clear from the record that Dr. Lewis was not aware of the issue of renal failure associated with Trasylol prior to Mr. Lucas' surgery.  Bayer has simply taken one statement from his deposition and inappropriately placed it before this court completely out of context.  When this section of Dr. Lewis' deposition is read in its entirety, it is readily apparent that Dr. Lewis was absolutely not aware of the issues related to renal failure.  In addition, once the full risks became known through the publication of the Mangano study, Dr. Lewis did in fact quit using Trasylol. Thus, a genuine issue of material fact exists as to whether a stronger warning, such as the warning adopted in 2006, would have caused Dr. Lewis to withhold Trasylol from Mr. Lucas.  The complete record not only creates a genuine issue of material fact but suggests that Dr. Lewis would, in fact, not have given Trasylol to Mr. Lucas had he been fully informed of the risks.

Dated:  August 11, 2010                                    Submitted By:


                                                           /s/ Benjamin W. Gordon Jr.
                                                           Florida Bar No: 882836
                                                            Email: Bgordon@LevinLaw.com
                                                           Brian H. Barr
                                                           Florida Bar No: 493041
                                                           Email: Bbarr@LevinLaw.com
                                                           K. Lea Morris
                                                           Florida Bar Number: 26612

Email: Lea.Morris@LevinLaw.com
Brandon L. Bogle
Florida Bar No: 52624
Email: Bbogle@LevinLaw.com
**Levin, Papantonio, Thomas, Mitchell,   Echsner, Rafferty, & Proctor, P.A.**
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
Telephone:    850-435-7000
Facsimile:    850-435-7020

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent to the

United States District court Southern District of Florida to be filed conventionally this11th day

of August, 2010.  I further certify that a true copy of the foregoing has been furnished to counsel

on the attached list via U.S Regular Mail and through the court's CM/ECF filing system.

/s/ Benjamin W. Gordon Jr.    
Benjamin W. Gordon Jr.

## SERVICE LIST

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON
### Case No. 9:08-cv-80423-DMM

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-735-1130
Facsimile: 215-875-7758
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE & LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile: 561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Email: plowry@ssd.com
Barbara Bolton Litten
Email: blitted@ssd.com
Guy E. Motzer
Email: gmotzer@ssd.com
**SQUIRE SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509
*Counsel for Bayer Defendants*

Scott Love
Email: slove@triallawfirm.com
**CLARK BURNETT LOVE & LEE GP**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: 713-759-1400
Facsimile: 713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone: 203-610-6393
Facsimile: 203-610-6399
*Federal-State Liaison for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509
*Liaison Counsel for Defendants*